UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL UNITED LIFE, INC., *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SYLVIA M. BURWELL, *et al.*, ) <br> ) <br> Defendants. ) <br> ) | Civil No. 14-1954 (RCL) |

## MEMORANDUM OPINION

Plaintiffs Central United Life Insurance Co. and Gaylan Hendricks (collectively, "plaintiffs") have brought this action against Sylvia Mathews Burwell, in her official capacity as Secretary of the U.S. Department of Health and Human Services ("HHS"); HHS itself; Marilyn B. Tavenner, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; and the Centers for Medicare and Medicaid Services (collectively, "defendants"). Plaintiffs sell insurance products known as "fixed indemnity plans." On March 27, 2014, defendants issued a rule that bars plaintiffs from selling fixed indemnity plans to individual consumers unless those consumers certify that they have "minimum essential coverage" under the Affordable Care Act. Plaintiffs seek to enjoin defendants from enforcing the rule on the grounds that it exceeds the defendants' statutory authority, violates the Constitution, and is arbitrary and capricious under the Administrative Procedure Act. 5 U.S.C. § 706.

Before the Court is plaintiff's Motion for Permanent Injunction [3] and defendants' Motion to Dismiss for Lack of Jurisdiction and/or Motion for Summary Judgment [25]. Upon consideration of plaintiff's Motion and Memorandum in Support thereof, defendants' Motions to

1

Dismiss and for Summary Judgment, the arguments made in open court on June 19, 2015, the entire record in this case, and the applicable law, the Court will GRANT plaintiff's Motion for a Permanent Injunction [3] and DENY defendants' Motion to Dismiss for Lack of Jurisdiction [25].

## I. BACKGROUND

### A. Statutory and Regulatory Framework

#### *1. The Public Health Service Act*

Congress passed the Public Health Service Act (the "PHSA") in 1944 to set nationwide standards for health insurance plans. Pub. L. No. 78-410, 58 Stat. 682 (1944), *amended by* Health Insurance Portability and Affordability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996). The PHSA's standards do not govern all health insurance policies, however, and "[h]ospital indemnity or other fixed indemnity insurance" that is "offered as [an] independent, noncoordinated benefit[]" is deemed an "excepted benefit" to which the PHSA's requirements do not apply. *See* 42 U.S.C. § 300gg-91(c)(3).

#### *2. The Affordable Care Act*

The Affordable Care Act (the "ACA") significantly changed the nation's insurance market when it passed on March 23, 2010. Pub. L. No. 111-148, 124 Stat. 119. Among other changes, the ACA for the first time required that every applicable person have "minimum essential coverage." 26 U.S.C. § 5000A. Anyone without it must pay a tax assessment as penalty. *Id.* at § 5000A(b)(1), (c), (g)(1). The ACA did not change any of the PHSA provisions which defined excepted benefits or exempted them from PHSA regulation.

#### *3. HHS Regulations*

On May 27, 2014, HHS issued a final rule (the "new Fixed Indemnity Rule" or "new rule") which provides that fixed indemnity plans will not be treated as excepted benefits unless sold to

people "who attest, in their fixed indemnity insurance application, that they have other health coverage that is minimum essential coverage within the meaning of [the ACA]." 79 Fed. Reg. 30240, 30341. Companies selling such plans to people without the required attestation could be penalized up to $100 per day per insured. 42 U.S.C. § 300gg-22(b)(2)(C)(i). The rule took effect on January 1, 2015. 79 Fed. Reg. 30240, 30256. The meaning of the rule in effect before this new rule took hold is disputed and will be addressed in the portion of this Opinion dealing with standing; for now, suffice to say that the previous rule imposed no such attestation requirement.

## II. LEGAL STANDARD

Plaintiffs must establish that, among other things, they have constitutional standing to bring this action. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). To establish standing, plaintiffs must show (1) they have suffered an "injury-in fact" that (2) the defendants caused and (3) judgment in their favor is "likely" to "redress." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The Court reviews HHS's decision under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701 *et seq.* Under the APA, a court may set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (2)(C).

A court reviews "an agency's construction of the statute which it administers" under the two-step process of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). Under *Chevron,* the court must determine first "whether Congress has directly spoken to the precise question at issue." *Id.* If Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent

of Congress." *Chevron*, 467 U.S. at 842–43. "[I]f the statute is silent or ambiguous" on that question, the court must defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Alabama Educ. Ass'n v. Chao*, 455 F.3d 386, 392 (D.C. Cir. 2006) (quoting *Chevron,* 467 U.S. at 843).

### III. ANALYSIS

#### A. Standing

Plaintiffs say they have standing because the new Fixed Indemnity Rule leaves them worse off than the old one. Defendants respond that because both versions of the rule effectively bar plaintiffs' fixed indemnity plans, plaintiffs' requested injunction displacing the new rule with the old would not redress their injury and they therefore lack standing. This response is, to put it mildly, counterintuitive. If a company selling fixed indemnity insurance doesn't have standing to challenge a rule imposing requirements on companies selling fixed indemnity insurance, who does? Defendant's argument is a recipe for eluding judicial review. Simply

1. Properly issue a rule that nominally puts companies in a certain market out of business, but decline to enforce the rule so that (a) no company bothers to challenge it and (b) any challenge that does arise is arguably unripe until the rule is enforced (an argument Defendants actually make *infra*). Then

2. Replace the old rule with a new one, passing whatever you like, however you like it, so long as those companies still go out of business.

Under defendants' curious theory of redressability, any wrongdoing at step two will never be confronted in court: Plaintiffs would lack standing to challenge either the first rule (which is no longer effective and was, in any case, properly issued) or the second (which injunction cannot redress because it is backstopped by the first). But defendants are wrong, and the government cannot strip a litigant of standing by chaining one harm to another in an Escheresque loop.

##### *1. Differing Compliance Costs Can Constitute Harm*

4

Defendants argue that (a) the old rule recognized fixed indemnity plans as excepted benefits only when the plans offered benefits on a "per-period" basis, i.e. every day, week, month, or other temporal interval, and (b) plaintiffs' fixed indemnity plans do not offer benefits on that basis. Plaintiffs reply that (a) the old rule counted fixed indemnity plans as excepted benefits regardless of whether they offered benefits "per-service," i.e. for every medical procedure or treatment, or per-period, and (b) that even if the old rule required fixed indemnity plans to offer per-period benefits, some of their plans offer benefits on a per-period basis, citing policy brochures which describe, among other things, benefits of "$500 per day in [the intensive care unit]." Pls. Br., Ex. A., Attach. 2 at 11. Defendants respond that plaintiffs' plans do not provide excepted benefits because, though duration is one input into the calculation of some (but not all) benefits, even the benefits that consider duration also consider the medical services provided. *See, e.g., id.* at 7 (offering "$2,500 per day" for confinement in the Intensive Care Unit but "$600 per day" for anesthesia).

Even if defendants are right, however, plaintiffs note that they could have changed their plans to comply with HHS's old rule by paying benefits on a per-period rather than per-service basis, but cannot so accommodate the new rule, which bars the sale of fixed indemnity insurance to anyone without minimum coverage. Defendants do not dispute that this constitutes a concrete harm. They instead respond that plaintiffs, who first raised the possibility of changing their plans to comply with the old rule in their motion papers, cannot by that method amend their Complaint, which fails to allege that possibility. Defendants also argue that plaintiffs have shown no evidence that they would stop violating the old rule if victorious. Defendants call plaintiffs' standing theory "speculative," and argue that speculative theories fail to establish Article III standing.

When courts discuss standing, they often use "speculative" as a pejorative shorthand for "theories that rest on speculation about the decisions of *independent actors*." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013) (emphasis added); *see also Ill. Pub. Tel. Ass'n v. FCC*, 752 F.3d 1018, 1027 (D.C. Cir. 2014). Theories of redress that are "speculative" merely in the colloquial sense of depending on a future uncertain event may nevertheless suffice to establish standing. *See, e.g., Lujan*, 504 U.S. at 560–61 ("[I]t must be *likely* . . . that injury will be redressed by a favorable decision.") (emphasis added) (internal quotations marks omitted) (citing *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). Here, plaintiffs' standing theory relies not on some independent third party, but on plaintiffs' own conduct. Additionally, as defendants have not yet filed a responsive pleading, plaintiffs may still amend their Complaint as of right. *See City of Dover v. EPA*, 40 F. Supp. 3d 1, 7 (D.D.C. 2013) (citing *Confederate Mem'l Ass'n, Inc., v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)). Dismissing plaintiffs' Complaint without prejudice for lack of standing and waiting for them to refile would be pointless. Consequently, the Court deems plaintiffs' Complaint amended in accordance with their representations made at the June 19, 2015 hearing regarding their preparedness to adhere, should they obtain the requested injunction, to defendants' interpretation of the old rule. Plaintiffs therefore have standing to bring this action.

### 2. *Ripeness*

Defendants, having just argued that plaintiffs' claim is unredressable because plaintiffs are in violation of both the old and new rules and are therefore harmed under either regime, now insist that the suit is also unripe because the new rule has not yet been enforced, i.e. plaintiffs have not yet been harmed by the new regime. One would have expected these arguments to be mutually exclusive—if the old, never-enforced rule that plaintiffs failed to comply with constitutes harm for

the purposes of redressability, surely a new and not-yet-enforced rule is harm sufficient for ripeness. The Court will assume defendants meant to argue in the alternative; nevertheless, defendants are wrong. As plaintiffs note, the law of the D.C. Circuit, even after *Lujan*, is that "an agency rule . . . is typically reviewable without waiting for enforcement." *Chamber of Commerce v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995). Additionally, "[t]he issue presented is a . . . pure legal one that subsequent enforcement proceedings will not elucidate." *Id.* at 604; *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir.) (whether an agency's action is contrary to law is a pure legal issue).

Defendants argue that *Conservation Force, Inc. v. Jewell*, which held that a challenge to agency policy is unripe unless it will "have its effects felt in a concrete way by the challenging parties," requires the dismissal of plaintiffs' claim. 733 F.3d 1200, 1206 (D.C. Circ. 2013). But that case and this one could hardly be less alike. In *Conservation Force, Inc.*, the plaintiffs argued that the Fish and Wildlife Service ("FWS") had unreasonably delayed in responding (as required by regulation) to their requests for permits, and further argued that even though those permits had eventually been granted, plaintiffs could still challenge the "pattern or practice of delay." *Id.* at 1205–06. The *Conservation Force, Inc.* court held that challenge unripe, noting that (1) FWS had already proposed a rule change that removed the permit requirement and therefore made future permit delays impossible, (2) even if that rule was never finalized, it was uncertain that plaintiffs would apply for another permit, and (3) that even if plaintiffs did apply for another permit, it was uncertain whether FWS would again delay. *Id.* at 1206. Here, on the other hand, every relevant element the *Conservation Force* court relied on in holding that challenge unripe is reversed: The new fixed indemnity rule is a final rule, not a proposed one. The parties and Court agree that plaintiffs are this very moment violating it, so no speculation about possible future violations is

needed. And finally, plaintiffs' threatened harm comes not from government's failure to enforce a rule—a presumption the Court is reluctant to embrace without evidence—but from the prospect of the government enforcing a rule, which presumption is the norm. *See Chamber of Commerce v. FEC*, 69 F.3d at 603. If anything, *Conservation Force* demonstrates why this case is ripe for decision.

### B. Merits

#### *1. Chevron Analysis*

The government's new reading of the phrase "fixed indemnity insurance" fails at *Chevron*'s first step because it has no basis in the statutory text it purports to interpret and plainly exceeds the scope of the statute. The government insists that this reinterpretation is consistent with, and indeed helps achieve, the statutory purpose. Even if that is true, it is insufficient: An agency "must 'ground its reasons for action or inaction in the statute,' rather than on 'reasoning divorced from the statutory text.'" *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (emphasis and citation omitted) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 532, 535, (2007)). The text of the statute uses "fixed indemnity insurance" to describe a category of insurance that Congress exempted from the PHSA, and HHS cannot rewrite that category free from statutory constraint.

Interpretation of a statute must begin with its text. *Am. Fed'n of Gov't Employees, AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013) (citing *Milner v. Dep't of the Navy*, 562 U.S. 562, 569 (2011)). Here, the relevant statutory language defines the set of "excepted benefits" to include, among other things, "fixed indemnity insurance." 42 U.S.C. § 300gg-91(c)(3). The phrase "fixed indemnity insurance" is undefined, and the legislative history gives no sign of what, if any, variation from everyday usage Congress envisioned.

The parties agree that what distinguishes fixed indemnity insurance is that its benefits are relatively predetermined—unlike a plan whose benefits could vary dramatically according to the severity of injury or illness, fixed indemnity insurance will pay, for example, $100 a week, or (assuming per-service benefits qualify) $50 per visit. 79 Fed. Reg. 30240, 30341. Plaintiffs argue that Congress clearly intended "fixed indemnity insurance" to mean insurance that "pays a fixed amount under specified conditions without regard to other insurance," and that under *Chevron* this clear meaning robs HHS of the power to reinterpret the language as requiring "minimum essential coverage"; in the alternative, they argue that even if the language is ambiguous, an interpretation requiring "minimum essential coverage" is unreasonable. Defendants say the phrase "fixed indemnity insurance" is ambiguous, as "pays a fixed amount under specified conditions" obviously contemplates yet-to-be-stated conditions, and that requiring "minimum essential coverage" simply fills the gap Congress deliberately left open.

The Court recognizes that more severe injury or illness may require more visits or longer periods of disability and thereby increase the amount of benefits paid under a fixed indemnity plan, and does not decide here whether fixed indemnity insurance has always necessarily included benefits paid on a per-service basis. But no matter what "fixed indemnity insurance" means at its margins, any attempt to define that phrase in a way that imports wholly foreign concepts is not an act of definition as this Court understands it. For example, imagine a statute which regulates clothing but not "hats." While the word "hats" is ambiguous insofar as it does not, by itself, explore the full range of qualifying headgear—do helmets count? Wigs?—it unambiguously does not mean "table," or "horse." It also does not mean "hats, but only those hats sold to people who already own shoes." The notion of "minimum essential coverage," which did not exist when Congress enacted the "excepted benefits" provisions of the PHSA, is no less foreign to the

9

definition of "fixed indemnity insurance." Congress has therefore "unambiguously foreclosed the agency's statutory interpretation . . . by granting the agency a range of interpretive discretion that the agency has clearly exceeded." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659–60 (D.C. Cir. 2011) (citing *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)). In the words of the Ninth Circuit,

> [w]hile statutory words sometimes have more than one meaning, and interpreting the statute may require judgment as to which of these meanings Congress contemplated, an interpreting body may not invent a completely new meaning for a statutory term. Any other rule of construction would rob statutes of binding force and allow free rein to those who implement federal statutes to do what they wish rather than what Congress directed.

*Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312, 316 (9th Cir. 1988).

*Chevron* itself illustrates this line between interpretation and invention. At issue in *Chevron* was the Environmental Protection Agency's ("EPA's") reading of the phrase "stationary source," and whether the EPA could adopt a plantwide definition (treating a factory or facility with multiple smokestacks as a single "stationary source") rather than an individualized one (treating each smokestack as a separate "stationary source"). *Chevron*, 467 U.S. at 840. While the distinction is certainly significant, both interpretations flow naturally from the underlying language, for, as Justice Stevens observed, "it is certainly no affront to common English usage to take a reference to a major facility or a major source to connote an entire plant as opposed to its constituent parts." *Id.* at 860. The difference was one of degree rather than of kind, and reconcilable with the statutory language.

Suppose, however, that the EPA read "stationary source" more narrowly still, and determined not only that a "stationary source" meant entire factories or facilities rather than individual smokestacks, but also that no factory or facility qualified as a "stationary source" unless it had been active for over five years. Must that interpretation be honored? No. The flaw is not

lack of a plausible policy rationale—one can certainly imagine the EPA deciding that plants built within the previous five years were designed with superior pollution-reduction technology, and that omitting such plants better balanced between achieving national air quality standards and encouraging economic growth—but rather the absence of any relationship between the substance of the agency's interpretation and the statute it has ostensibly construed. Defendants' proposed requirement of "minimum essential coverage" is likewise orthogonal to the concept of "fixed indemnity insurance."

Defendants argue that the statutory phrase "independent, noncoordinated benefits" either (a) necessarily presumes the existence of other coverage or (b) is ambiguous, and the Court should defer to defendants' interpretation of that language. But these words clearly do not mean what defendants want them to. Section 300gg-91's provision defining "excepted benefits" lists "fixed indemnity insurance" under "[b]enefits not subject to requirements *if offered* as independent, noncoordinated benefits" (emphasis added). The only reasonable interpretation of that sentence is that the statute looks to the seller's conduct—are they offering the ostensibly excepted benefits in tandem with other benefits?—and not the buyer's. The statute allows for the possibility of a buyer possessing other coverage but does not require it.

Defendants also argue that rejecting their new interpretation of "fixed indemnity insurance" would require ignoring 42 U.S.C. § 300gg-92, the provision authorizing HHS to make regulations to accomplish the goals of the PHSA. It is undeniable that HHS has such authority. It is equally undeniable that HHS may not use such authority to contravene the very statute they are implementing.

2. *Injunctive Relief*

11

Defendants argue that (a) plaintiffs' delay in filing this suit "weighs against" a claim of irreparable harm and that they are therefore unentitled to injunctive relief, (b) the equitable defense of "unclean hands" bars plaintiffs' request, and (c) that the balance of equities tips in favor of denying the requested injunction. None of these arguments are convincing. Where delay is unjustified and prejudicial, it can warrant denying a permanent injunction. *See NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) (citing *Independent Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C. Cir. 1980)). Defendants, however, have offered no evidence or argument that plaintiffs' six month delay in filing this suit was either of these, let alone both, and plaintiffs have offered both a reasonable explanation for the delay and ample (and unrebutted) reasons to believe that they would suffer irreparable harm if the new fixed indemnity rule remains in force. According to Gaylan Hendricks's Declaration, Pl's Mot. Prelim. Inj, Ex. B at 5–8, the new rule threatens the viability of plaintiffs' business and workforce. *See Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("In contrast, where we have found irreparable harm, the very viability of the plaintiff's business . . . or substantial losses of sales beyond those of the terminated product . . . have been threatened."). Defendants insist that a six month delay "weighs against" the finding of irreparable harm but neglect to explain how great that weight is, or why it outweighs the serious harms they have chosen not to dispute. The Court therefore concludes that plaintiffs' delay does not justify denying their requested injunction.

With respect to the doctrine of unclean hands, the "doctrine only applies when there is a direct nexus between the bad conduct and the activities sought to be enjoined." *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir. 1985) (quoting *International Union, Allied Industrial Workers v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir. 1982)). Even if defendants' interpretation of the old fixed indemnity rule is correct, plaintiffs' history of violating the old rule

appears to have no causal relationship to this challenge against the new one, and defendants have not even tried to show otherwise; indeed, had plaintiffs scrupulously honored the old rule, they would be no less doomed by the new one, and no more justified in challenging it.

Lastly, defendants argue that plaintiffs' requested injunction would be against the public interest because the policy goal ostensibly achieved by the new rule is a worthy one which injunction would forestall, and though they gamely repurpose points about the legal merits of the parties' statutory interpretations as points about the greater good, these arguments are no more persuasive the second time around. Insofar as defendants mean that this Court should refuse plaintiffs' requested injunction against the new rule, even if it is meritorious, on the grounds that the new rule produces a net good result and enjoining it will produce a net bad one, the Court is likewise unconvinced. Forcing federal agencies to comply with the law is undoubtedly in the public interest, and defendants have not shown to the Court's satisfaction that this clear benefit would be outweighed by the harms putatively caused by plaintiffs' policies. For these same reasons, plaintiffs have shown that the balance of equities favors them.

### 3. *Inapplicability of* National Federation of Independent Business v. Sebelius

Finally, plaintiffs argue that the new rule contravenes the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012), which held that the ACA's "individual mandate" could only survive as an exercise of Congress's taxing power, and that the government may not "attach [additional] negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS." *Id.* at 2597. Plaintiffs are exactly wrong: The new rule attaches negative legal consequences to the set of people who do not have "minimum essential coverage" who *choose to buy* fixed indemnity insurance. Unlike the people at issue in *Sebelius*—who did not participate in the health insurance market at all, and were in fact

being forced to do so—the new rule affects people who decided on their own to participate in the market. *Sebelius* is therefore inapplicable and does not provide a basis on which to invalidate the new rule.

## CONCLUSION

For the foregoing reasons, plaintiff's Motion for Permanent Injunction will be GRANTED, and defendants' Motion to Dismiss for Lack of Jurisdiction and/or Motion for Summary Judgment will be DENIED, in a separate order issued this date.

Signed by Royce C. Lamberth, Judge, on September 11, 2015.